UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**William F. Nagle,**

**Plaintiff,**

**-v-**                                              **5:11-CV-855**

**Carolyn W. Colvin, Acting Commissioner of Social
Security, in place of Michael Astrue,**

**Defendant.**

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

APPEARANCES:

Binder & Binder, P.C.
Charles E. Binder, Esq., of counsel
Eddy Pierre Pierre, Esq., of counsel
60 East 42nd Street, Suite 520
New York, New York 10165

Hon. Richard S. Hartunian, United States Attorney
Karen G. Fiszer, Esq., Special Assistant United States Attorney
Social Security Administration
Office of Regional General Counsel, Region II
26 Federal Plaza - Room 3904
New York, New York 10278
Attorney for Defendant

**Hon. Norman A. Mordue, Senior U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER
### INTRODUCTION

Plaintiff, born on May 22, 1959, worked as a union painter/drywall finisher for a

construction company from January 1987, through December 2008.  On December 1, 2008, he

applied for Social Security Disability ("SSD") benefits, claiming disability due to back pain,

bulging disc injury, compression fracture at L5, and severe muscle spasms.  After the initial denial

of his application, he requested a hearing.

Administrative Law Judge ("ALJ") Jeffrey M. Jordan held a hearing on October 6, 2010 and heard testimony by plaintiff and a vocational expert called by the Social Security Administration. By decision dated November 9, 2010, the ALJ determined that plaintiff had the severe impairments of "disorders of the back, sciatica, and myofascial pain syndrome," but that the impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d); 404.1525; 404,1526. The ALJ further found that plaintiff did not have the residual functional capacity ("RFC") to perform his past work, but that he was able to perform other work. Thus, the ALJ determined that plaintiff was not disabled under the Social Security Act during the period from December 1, 2008 to November 9, 2010. On May 23, 2011, the Appeals Council denied plaintiff's request for review; thus, the ALJ's decision became the final decision of the Commissioner of Social Security ("Commissioner").

Plaintiff seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). He contends that the ALJ erred in holding that, although admittedly he is unable to perform his past work, there is other work that he could perform. Plaintiff asks the Court to reverse the Commissioner's decision denying benefits and to remand the matter for payment of benefits. In the alternative, he asks the Court to remand the matter to the ALJ for a new hearing. As set forth below, the Court finds that plaintiff was disabled for purposes of the Social Security Act from December 1, 2008 until November 9, 2010, grants plaintiff's motion for judgment on the pleadings (Dkt. No. 9), denies defendant's motion for judgment on the pleadings (Dkt. No. 13), and remands for calculation of benefits.

## APPLICABLE LAW

-2-

To be found eligible for SSD benefits, a claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d). The Commissioner uses a five-step process, to evaluate such claims. As the Second Circuit explains:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him *per se* disabled. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (alterations omitted)); *see* 20 C.F.R. §§ 404.1520, 416.920. A claimant's residual functional capacity ("RFC") is defined as follows: "Your impairments(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is what you can still do despite your limitations." *Tejada v. Apfel*, 167 F.3d 770, 774, n.3 (2d Cir. 1999) (citing 20 C.F.R. § 416.945(a)).

The burden is on the claimant to establish disability at the first four steps. The existence of a medically determinable impairment must be established by an acceptable medical source, in this case a physician. *See* 20 C.F.R. § 416.913(a). In addition to evidence from acceptable medical sources, evidence from other sources, including nurses, educational personnel, and family

members, may be used to show the severity of an impairment and how it affects the claimant's ability to work. *See* 20 C.F.R. § 416.913(d). If the claimant establishes an impairment that prevents him from performing his past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (citing 20 C.F.R. § 404.1560(c)(2)) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's residual functional capacity"); *Selian*, 708 F.3d at 418 & n.2.

The Court "may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted). The Commissioner's findings as to any fact, "if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Shaw*, 221 F.3d at 131 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

## THE MOTIONS

The ALJ found, and it is not disputed, that between December 1, 2008 and November 9, 2010, plaintiff had the severe impairments of "disorders of the back, sciatica, and myofascial pain

syndrome"; that the impairments were expected to last for a continuous period of not less than 12 months; that the impairments did not meet or medically equal one of the listed impairments; and that plaintiff did not have the RFC to perform his past work. Plaintiff challenges the ALJ's determination of his RFC and his conclusion that plaintiff is able to perform other substantial gainful activity and therefore is not disabled.

The Commissioner adopts the ALJ's summary of the testimony and evidence. The Commissioner contends that the ALJ's conclusion is supported by substantial evidence and is legally correct.

## THE ALJ'S DECISION

In pertinent part, the ALJ's decision is as follows:

> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to: lift and carry 20 pounds occasionally and ten (10) pounds frequently at waist to chest level; stand a total of six (6) hours in an eight (8) hour workday; sit a total of six (6) hours in an eight (8) hour workday; walk a total of 200 yards in an eight (8) hour workday; push or pull less than five (5) pounds occasionally; never climb ladders, ropes, or scaffolds; never crawl or kneel; occasionally balance, stoop, and crouch; and perform simple, routine, and low stress tasks.

> In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

> In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

The claimant alleges an inability to work because of back pain, bulging disc injury, compression fracture at LS, and severe muscle spasms. He alleges that as a result, he is unable to stand, sit, bend, or walk for any length of time. At the hearing, the claimant testified that he is unable to lift heavy weight or do any overhead reaching because doing so will trigger muscle spasm. He testified that he experiences sharp, stabbing muscle spasms in his right side on a daily basis. The claimant testified that although he did physical therapy and injection therapy, such treatment provided little relief from his symptoms. He testified that the medications he takes to relieve pain "fog" his brain. He testified that if he were working, he would probably need a break every two (2) hours to lie down and apply ice.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

In terms of the claimant's alleged physical impairments, evidence demonstrates that he sustained a compression fracture at LS upon falling in 1980, and he re-injured his back sometime thereafter upon doing some lifting. An MRI of the claimant's lumbar spine completed in August 2006 revealed small disc protrusions at the L3-4, L4-5, and L5-Sl levels. At that time, it was determined that the most prominent protrusion at the L3-4 level may be displacing the L3 nerve root. On June 12, 2008, an MRI of the claimant's lumbar spine only revealed small central disc protrusion at the L5-S 1 level into the ventral epidural adipose tissues. At that time, it was determined that there was no evidence of nerve root compression or compromise. Evidence demonstrates that, in addition to pain associated with the degenerative changes seen with imaging studies, the claimant also experiences significant muscle spasms in his back.

Although the claimant alleges that his back impairment is disabling, treatment records dated May 20, 2009 indicate that the claimant believes he is capable of performing light duty work despite experiencing what he described as constant low and mid back pain and frequent muscle spasms along his back. Such restriction prevents the claimant from performing the duties of his then current job as a construction worker, but does not preclude his performance of other work activity requiring a light level of exertion.  In fact, a statement from the claimant's treating physician, Maura McCauley, M.D., indicates that merely any physical activity beyond walking worsens the claimant's symptoms.  At the hearing, the claimant testified that if he were working, he would require a break every two (2) hours to lie down and apply ice to his back.  However, when he requested a note from his treating physician in May 2009 restricting him to light work, he did not mention the need for such requirement secondary to his physical condition.

In terms of treatment, evidence demonstrates that the claimant is currently using a regimen of oral medications which provide fairly good relief of his symptoms in light of it being determined that he is not a candidate for surgery. Treatment records dated September 25, 2009 indicate that the claimant has been prescribed use of a Fentanyl patch which, per his report, has worked well.  Additionally, the claimant was prescribed Baclofen which, per his report, really helps the muscle spasms in his back.

On October 1, 2009, the claimant underwent an internal medicine evaluation conducted by State agency consultative examiner Look Persaud, M.D., to determine the degree of his functional limitations. During the evaluation, Dr. Persaud observed that the claimant appeared to be in moderate acute and chronic distress while appearing to experience intermittent spasms in his back, some quite severe with jerking of his upper body. However, at the hearing, the undersigned observed that the claimant exhibited no visible signs of pain; he answered all questions asked of him absent any evident deficits in concentration.[1]  Upon physical examination, Dr. Persaud noted that the claimant exhibited limited, painful forward elevation of the shoulders; limited, painful range of motion of the thoracic and lumbar spines; right sacroiliac joint tenderness; moderate paraspinal tenderness; and had difficulty walking on heels and toes. However, Dr. Persaud also observed that the claimant exhibited normal motor strength in both the upper and lower extremities; intact hand and finger dexterity; full range of motion of the cervical spine absent any trigger points; no sensory abnormalities; and full range of motion of the lower extremities.

---

[1] The hearing lasted half an hour (8:56 a.m. to 9:27 a.m.), according to the transcript.

Treatment records indicate that as of December 2009, the claimant reported feeling better overall despite becoming excessively sleepy for approximately three (3) to six (6) hours after reapplying a Fentanyl patch, becoming very tired upon taking Cyclobenzaprine, and heartburn symptoms upon taking Aleve. In an effort to address such side effects, he was instructed to utilize the brand-name Duragesic patch and take Protonix one-half hour before a meal to better tolerate Aleve. He was instructed to continue taking Cyclobenzaprine as prescribed.

Although the claimant alleges significant functional limitations, evidence demonstrates that he engages in a wide range of activities of daily living. During the internal medicine examination, he informed Dr. Persaud that he does no lifting; however, such statement is inconsistent with his testimony regarding his hobby of flying remote controlled helicopters. Additionally, the claimant reports being able to prepare simple meals, do light housecleaning, go shopping once a week, and adequately care for his personal needs. He enjoys watching television, listening to the radio, reading, going for walks, and socializing with friends.

As for the opinion evidence, the record contains conflicting opinions pertaining to the claimant's ability to carry out basic work activities.

I have considered the opinions of Maura McCauley, M.D., the claimant's treating physician, concerning the severity of the claimant's functional limitations. Although Dr. McCauley has an extensive treatment history with the claimant, it is important to note that Dr. McCauley is a family practitioner not likely qualified to assess the claimant's work limitations. Furthermore, Dr. McCauley's opinions concerning the claimant's functional limitations are internally inconsistent. In May 2009, Dr. McCauley determined that the claimant is capable of performing light duty work, while in August 2009, she determined in part that he should be limited to lifting no more than ten (10) pounds, take unscheduled breaks every one (1) hour, and would likely be absent two (2) to three (3) times a month. Dr. McCauley's statement concerning the frequency with which the claimant would need to take an unscheduled break is inconsistent with the claimant's own testimony at the hearing citing a need to take a break every two (2) hours. Finally, in November 2009, Dr. McCauley opined that the she does not think the claimant is able to work at all. However, it must be noted that such conclusions are on an issue specifically reserved under the Regulations to the Commissioner (20 CFR 404.1527(e) and SSR 96-5p). For these reasons, the undersigned affords little weight to the opinions of Dr. McCauley concerning the claimant's inability to work or lift more than ten (10) pounds. However, the undersigned affords greater weight to the opinion of Dr. McCauley concerning the

claimant's ability to lift no more than 20 pounds and refrain from doing excessive stretching, especially overhead reaching.

It is noteworthy that nurse practitioner Christine Morse is not an "acceptable medical source" as defined within the meaning of the Regulations. Pursuant to the Regulations, such reports and opinions are considered "other" evidence, of less probative value than information from an "acceptable source," i.e., licensed physicians (20 CFR 404.1513). However, such reports may be considered to demonstrate the severity of a claimant's impairments. Accordingly, the undersigned affords significant weight to Ms Morse's assessment that, because of physical limitations, the claimant is unable to return to his previous work as a constructions worker. Interestingly enough, Dr. McCauley's act of referring the claimant to Ms. Morse because she is a pain management specialist serves as a greater indication that she does not possess the requisite expertise to assess the claimant's work limitations.

The undersigned has considered the opinion of State agency consultative examiner Look Persaud, M.D., concerning the severity of the claimant's functional limitations. In the opinion of Dr. Persaud, the claimant has mild restriction with prolonged sitting, standing, and walking; moderate restriction with walking on uneven terrain, up inclines, ramps and stairs; moderate to marked restriction with squatting, kneeling, crawling, bending, twisting, and turning; moderate to marked restriction for lifting, carrying, pushing, and pulling; mild to moderate restriction with overhead reaching; and mild restriction with reaching in all other planes. Although the opinion of Dr. Persaud is based upon a one-time examination, he is an orthopedic specialist who is in a better position to assess the claimant's work-related limitations stemming from a back disorder. For this reason, the undersigned affords significant weight to the opinion of Dr. Persaud concerning the claimant's functional limitations.

In sum, the residual functional capacity assessment noted above is supported by the objective medical evidence and other evidence of record which demonstrates the claimant is capable of performing basic work activities at a reduced level of exertion coupled with certain nonexertional limitations. The residual functional capacity noted above is further supported by the opinion evidence of record.
***
7. The claimant was born on May 22, 1959 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 C.F.R. 404.1563).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

***

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

In determining whether a successful adjustment to other work can be made, the undersigned  must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11).   When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14).  If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21 and Rule 202.14. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.  The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as:

ticket seller, DOT code number 211.467-030, of which there are approximately 100,000 jobs in the national economy and approximately 900 jobs locally;

gate attendant, DOT code number 344.667-014, of which there are approximately 38,000 jobs in the national economy and approximately 900 job s locally; and

office helper, DOT code number 239.567-010, of which there are approximately 100,000 jobs in the national economy and approximately 3,000 jobs locally.

Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the DOT. Even assuming the claimant required the additional limitations of lifting and carrying less than 10 pounds occasionally and a sit/stand option, the vocational expert testified that based on his experience and clinical judgment such an individual could perform the jobs cited above.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rules.

(Citations to record omitted.)

## THE RECORD

**Plaintiff's Evidence**

Plaintiff, born May 22, 1959, submitted a "Disability Report - Adult - Form SSA 3368" which included the following[2]:

A What are the illnesses, injuries, or conditions that limit your ability to work? Back pain, bulging disc injury, compression fracture L5, severe muscle spasms
B. How do your illnesses, injuries, or conditions limit your ability to work? I cannot stand, sit, bend, or walk for any length of time. I cannot lift the required weight or stretch.
C. Do your illnesses, injuries, or conditions cause you pain or other symptoms? Yes
D. When did your illnesses, injuries, or conditions first interfere with your ability to work? 12/01/1997
E. When did you become unable to work because of your illnesses, injuries, or conditions?

---

[2] The form is undated but based on other references in the record it appears to have been submitted on August 19, 2009.

12/01/2008
F. Have you ever worked? Yes
G. Did you work at any time after the date your illnesses, injuries, or conditions first interfered
with your ability to work? Yes
H. If "Yes," did your illnesses, injuries, or conditions cause you to:
    work fewer hours? Yes
    change your job duties? Yes
    make any job-related changes such as your attendance, help needed, or
    employers? Yes
Explain:
Continued to work with great pain and difficulty. Took days off because of pain and doctors appointments. Had to have other employees do my lifting.
I. Are you working now? No
If "NO," when did you stop working? 12/01/2008
J. Why did you stop working?
My doctor advised me I am no longer able to pursue further employment due to my conditions.

In the report, plaintiff stated he was being treated by Maura McCauley, M.D. for "physicals, annual check up, referrals," and Andrew Morpurgo, M.D. for "severe back pain, bulging disc injury, compression fracture of L5, severe muscle spasms."  He was taking amitriptyline, fentanyl, oxycodone, and tizanidine.

The file also contains a New York State Office of Temporary and Disability Assistance form completed by plaintiff dated September 7, 2009.  The form includes a section regarding the claimant's daily activities.  Asked to describe what he does from the time he wakes up until he goes to bed, plaintiff wrote:

Take shower, eat breakfast. Take meds. Watch news & hunting shows. Take a short walk. Read on computer & reply to emails. (Sometimes fly r/c helicopter out back. That's my hobby.) Lay down & rest back on floor and watch TV. Make my lunch & eat lunch. Wash my dishes & make the bed. Sometimes play video games or walk over to my mother's house, 75 yards down the road. Sometimes go to Go Kart track and watch my buddies race, at night. Drive 10 miles to store for small items needed. Go out & sit under the tree & read.

The form further includes the following questions and answers:

> What were you able to do before your illnesses, injuries, or conditions that you cannot do now?
> Lift weight over 12.5 lbs without pain. Stretch over head with my hands. Sit or stand for long periods of time. Carry any weight up stairs or down. Climb ladders to paint. Twist upper body left or right without spasms. Sit and lift 10 lbs or more out in front of me or to my side. Walk on uneven ground, climb hills or hunt deep in the woods. Ride a riding lawn mower. Use a tree climber to hunt deer. Run. Sports. Ride a four wheeler. Draw a high powered bow and arrow.
> ***
> List household chores, both indoors and outdoors, that you are able to do.
> Dust, dishes. (Sometimes run the vacuum, on a good day only, one room.) Turn on the washing machine, use a walk-behind self-powered mower and only mow 1/3 of ½ acre of yard at most.
> ***
> If you don't do house or yard work, explain why not.
> If I don't do the basics it's because I am having a bad day. I can't do too much. The lawn is the hardest. I cannot ride on a mower. It rocks me back and forth too mcuh and hurts my back. I can only walk on the uneven ground for a short time. So I only do 1/3 of my yard when I can.

He wrote that he shops for hobby parts or small groceries for ½ to 1 hour "maybe once a week."

In response to a question regarding his hobbies and interests, plaintiff wrote: "Watching TV. Playing video games, Flying R/C helicopters. (Hunting but it is getting very hard to do any more.) Reading & watching NASCAR & going to the Go Kart track to watch my buddies race. I stopped racing 2 years ago." Asked how often he did the activities, he responded: "Every week. Daily on most. Unless I have a bad day. Then I just lay down and rest my back and apply ice." Asked to describe any changes in these activities since your illnesses, injuries, or conditions began, he wrote:

> I now can't sit in one spot too long without shifting or getting up for a few minutes. I can no longer walk deep in the woods to hunt. I can no longer drive a Go Kart. I can't use a climbing tree stand to hunt. I need someone to drag my deer if I get one. I may have to give up hunting in the woods.

The section headed "Information About Your Abilities" included the following response:

> I cannot lift much weight at all now.  I cannot sit too long (no movies other than home).  Walking is slow and I can't go a long way any more.  Standing makes my back ache if I stand too long.  Climbing stairs causes spasm.  Kneeling is so-so but it's hard to get up sometimes.  Squatting is hard on my back.  Reaching is real bad on my back.

The form continued:

> How far can you walk before you have to stop and rest?
> Good day = 100 yards or so.  Bad day = approx. 10 - 25 yards.
>
> How long do you rest before you can continue walking?
> Resting by standing doesn't help that much.  So maybe five min or so.  A bad day would be the least amount of walking, period.

Plaintiff continued:

> I am very unable to do my job as a Union Painter and drywall finisher.  I have been having these problems for at least four years where the pain is just too much.  My job requires a lot of physical movement and lifting, stretching, bending, standing, climbing, and using heavy equipment. ...  I have adjusted my ways of life now to reduce my pain but it has many limitations.

Plaintiff added that the pain developed over ten years ago; that it first began to affect his activities about five years ago; that the ache is constant; that he gets stabbing sharp spasms; and that he feels the pain on the right side of his back, "belt line going up right side near spine."  The pain is always in the same area but has increased as the years have passed.  He experiences the pain all the time; it is brought on by activity in general, such as lifting, climbing, reaching, bending, sitting too long, standing too long, and any jarring of his back.  At the time, he was taking fentanyl, baclofen, and amitriptyline.  He stated that he has been on pain medications for over five years, and noted that they were getting stronger as time went on.  His doctor has changed the medications "due to pain increase & meds not working enough."

-14-

Plaintiff completed another (undated) disability report. He stated that, since the August 19, 2009 disability report, he has "increased back pain and muscle spasms on a daily basis" and that since approximately October 15, 2009 he has had "difficulties sitting, standing or walking for long periods of time." He stated that Dr. McCauley diagnosed him with "Bulging disc injury, Severe back pain, Severe muscle spasms, Compression fracture of L5." He listed his current medications as amitriptyline, cyclobenzaprine, fentanyl, ibuprofen, oxycodone, and tizanidine HCL. Plaintiff wrote that he was able to care for his personal needs, "however, at a slower rate and with great difficulty" and that his "daily activities are limited due to [his] ongoing conditions."

The file contains a SSA form headed "Claimant's Recent Medical Treatment" completed by plaintiff, dated August 5, 2010. Plaintiff reported that he had been seeing Christina Morse at Cayuga Medical Center Pain Clinic (Ithaca Center for Pain Management) ("Pain Center") every two to three months. In response to the question of what he has been told about his condition, plaintiff wrote: "I fractured L-5 in lower back years ago, severely damaged right lower & midback muscles & there is no repair possible, not even surgery. That I have 3 bulging discs and I should not lift heavy objects, no twisting, bending, or stretching. I was told not to return to working as a painter and to work at relieving back pain as much as possible and do not injure myself." His medications were fentanyl patch, amitriptyline, cyclobenzaprine, and aleve. As of October 6, 2010, plaintiff reported that he was taking opana (oxymorphone), amitriptyline, cyclobenzaprine, and naproxen sodium.

At the hearing on October 6, 2010, plaintiff testified under questioning by his attorney as follows:

Q  Okay. So tell us about why you're unable to work.

A  Well, my back pain has just gotten to the point where it's so bad that I just can't stand or sit for any length of time. By that, I mean like more than an hour or two. I get very severe spasms. I can't reach, pick up any heavy weight.

Q  Describe the pain . How does it feel?

A  I get a very sharp, stabbing spasm in my right side that if I continue to do any long duration of picking up any items or rotating my upper body, it will create the spasm so bad that it will just pull me down to the floor, because it gets so tight the spasms just keep getting increasingly stronger and just basically wind me up.

Q  So tell me what you do when your back starts spasming.

A  I usually, well, I always have to lay down on the floor and usually apply an ice pack to it just to calm the spasms down. Basically, the best thing for me to do is to rest on a hard surface or lay down in a very hard bed to relieve the back spasms. Plus, I have to take an awful amount of medication.

Q  And this has been ongoing since you stopped working?

A  Yes.

Q  And was it existing before that?

A  For at least two to four years before that.

Q  How often do you experience these kinds of spasms?

A  Every day.

Q  Are you experiencing them now?

A  Yes.

Q  I believe I did note that. Tell me about your daily routine.

A  Daily routine is actually very boring, but I get up, have my coffee, take my morning medicine. Usually I'll go back and lay down in bed for at least an hour, hour and a half to let the medicine kind of kick in because when I get up in the morning I'm usually very sore because the medicine won't last throughout the evening or throughout the night. Sometimes it will wake me up, but, you know, 3:00 or 4:00 in the morning, then I'll get up and take a five milligramer of Opana to get me through until my morning time, which is 8:00, when I take my normal pill of the 40 milligram, and then just try to take it very easy. I do read, watch television and don't do a lot. Maybe walk across the street and go visit my dad. Sit down up in the bar and talk to him for a while.

Q  How far is your dad from where you live?

A  About 100 yards. I walk across the street.

Q  Okay. And what do you find is the longest you can walk for without being in major discomfort?

A  I try to get as much walking in as I can to help not make this any worse, so I mean I try to get my exercise, which is a good thing. How far can I walk without? Two hundred yards.

Q  Then what happens?

A  If I stay on my feet and walk too far, I'll just start getting spasms.

Q   Okay. And then what would you do at that point?

A   Back laying down to rest.

Q   Okay. So, I'm sorry, continue with your daily activities.

A    So other than excessive amount of watching TV, or I'll lay on the floor and I have a laptop that, with a table that can lay over me and I'll talk to some of my buddies around the world online.

Q   And what position are you in when you're using your computer?

A   Laying down with my back propped up on a pillow.

Q   Okay.  So you're pretty much horizontal?

A   Very horizontal. I have a little table that has a angle to it.

Q   When you're watching TV,  what kind of position are you in?

A   Laying down.

Q    So about how long do you find yourself sitting in an upright position during the course of the day?

A   I can sit for an hour and then I usually have to get up. I mean, an hour is about my max. If I push myself on a good day, for two hours in a seated chair. As long as it's a straight back like I'm in now, that's the best position, but two hours, I'm usually going to end up having some pain.

Q   And when will you experience that pain?

A   Just like within, you know, an hour or two of sitting it's just, it will start increasingly getting worse, and if I don't relieve it with a ice pack either by laying it on and pressing back, or the best bet is to actually just lay down on a ice pack.

Q   Do you find that you can sit longer if you alternate between sitting and standing?

A   No. It doesn't really help at all.

Q   Okay. So what provides relief?

A   Laying down, definitely, to get the, I don't know if it's pressure on a nerve or what it is, but that spasm, when it hits me it's like a knife stabbing me in the back.

Q   Continue with your daily activities.

A   If I drive to the store to pick up an item or two throughout the week it's before noon, and that's about the time that I have to take my medicine for break through pain. So, I mean that's a big out for me is just to drive a short distance, break up the day.

Q   How much driving do you do in a typical week?

A   Gosh. Maybe 20 miles throughout the week.

Q   Is that spread out over several drives?

A    Yes, that's quite a few different drives. It's like a six mile trip, country road, to the store.

Q   And why don't you drive more than that?

A   My medicine just fogs my brain that it scares me.  I've been in too many situations where get into a traffic rule area where there's streetlights, stop

signs, pedestrians, and I've scared myself too many times while taking my medicine.

Q   So is it correct then that the jobs that, I'm sorry, the drives that you do are in very rural areas? Not a lot of cars on the road?

A   No.  It's just down the road, down a city or a country block or two. No lights, no traffic signs. You know, I mean I don't go out and joy ride by all means.

***

Q   If you were physically able to, would you want to work?

A   Absolutely.

Q   And what about a job not as demanding as your previous work? What about a job where you would be able to sit or stand at your choosing, and you didn't have to do any heavy lifting and it was pretty straightforward, simple? Would you be able to do that kind of job 40 hours a week?

A   No. I mean there's really no way I can stay on my feet or back and forth sitting and standing without having to at least go lay down and apply the ice or take enough medicine to be coherent enough to do a job.  I mean I have some medicines that can definitely help kill a lot of the pain, but then I'm just a gob of goo, I would say, that it just relaxes me so much and kills the pain that I just sleep throughout a good part of some days .

Q   So in this job how often would you be requiring breaks to lie down?

A   Probably every two hours would be nice.

Q   And for how long, approximately?

A   If I'm just going to lay down to take a break to be able to just continue to go back to work, I'd have to at least ice down for 10, 15 minutes, but if I did that every day it would just compile and catch up to me and just put me down.

Q So you think after several days you might be able to handle it, but then over time, over a week or two --

A   It wouldn't even take a week.

Q   How long do you think you'd be able to sustain that?

A   If I pushed myself, three days. It's usually, if I try to stay on my feet and do something for like three days in a row, it's usually going to put me down for a couple of days of being able to really take it easy, overmedicate with the muscle relaxers, which knock me on my butt.

Q   So you're saying if you pushed yourself a few days in a row, then you would pretty much have to do nothing after that for the new few days?

A   Definitely.

Q   Okay. You've had pain injections, is that correct?

A   Trigger point injections, yes.

Q   Trigger point injections. And you did physical therapy?

A   Yes.

***

Q   Is there anything else that you haven 't discussed that you want to speak

about regarding your
impairments?
A No. Not offhand. My medicine is just, it's not really that much on the ball, you know? I get a little foggy. If I sit down and really seriously thought about it, I might be able to come up with something.

The ALJ questioned plaintiff as follows:

Q When you go to visit your father, how long are you there?
A I can maybe hang out with him for an hour and that's about it.
Q Have you talked to your doctor about the side effects of the medication?
A Yes.
Q Who's your treating physician, sir?
A I have Christina Morse ... and Dr. McCauley....
Q Dr. [McCauley] is a family practitioner?
A Yes.
Q Did she advise you at one time that you needed to do light work?
A Yes. Quite a few times, actually.
Q The other, Morse, is she a pain management specialist, sir?
A Yes, she is.
Q Have any of your treating physicians recommended back surgery?
A No. Actually, I asked them that when I first when in, that I was begging for some kind of relief, and they said that back surgery is not going to cure my problem.
***
Q How much weight do you lift and carry, sir?
A I can carry five pounds, but not -- if I had to carry it for a long distance or actually pick five pounds up and move it from Point A to Point B, whether it's, you know, a few feet continuously, that's, I can't do that. I can pick up a gallon of milk out of the refrigerator and pour it for myself, but two handed.

**MRI Results**

A report dated August 10, 2006 of a MRI scan of plaintiff's lumbar spine states:

"Impression: small disc protrusions at the L3-4, 4-5 and S-1 levels. Most prominent is in the far lateral location on the left at the L3-4 level which may be displacing the L3 nerve root." Eric Lessinger, M.D. is named as plaintiff's physician.

The medical records include a report from Cayuga Medical Center at Ithaca dated June 12,

2008 of a MRI scan of plaintiff's lumbar spine. The impression is: "Small central disk protrusion at the L5-S1 level into the ventral epidural adipose tissues but without evidence of nerve root compression or compromise." Copies of the report were sent to Dr. Lessinger and Andrew J. Morpurgo, M.D.

**Records of Trumansburg Family Health Center**

Records of the Trumansburg Family Health Center show that as of August 2, 2002, plaintiff was being seen by Eric Lessinger, MD for back pain. Dr. Lessinger prescribed vicodin. Plaintiff had been undergoing physical therapy which was helpful. On May 26, 2004, Dr. Lessinger noted that plaintiff needed medication renewal for chronic low back pain; that he used vicodin at night and ibuprofen during the day and was able to work. On December 20, 2004, August 31, 2005, February 6, 2006, Dr. Lessinger continued plaintiff's vicodin (hydrocodone) prescription for chronic back pain and at some point began prescribing oxycodone as well.

Dr. Lessinger's notes of December 13, 2006 include the following: "[Plaintiff] comes in for follow-up. He says he is 'sore as ever.' He uses ice on his back at night and that helps. When he comes home from work he can't sit or lie down. He has to kneel and stretch out his back for awhile." Dr. Lessinger diagnosed chronic back pain with recent acute strain and prescribed vicodin as well as oxycodone concentrated liquid instead of capsules. He added: "He'll continue to work and I will refer him to CMC Pain Clinic to see whether Dr. Sanito might think a facet joint injection would be helpful for him. I don't think a neurosurgical referral is particularly advisable."

Plaintiff did not work after December 1, 2008. The claimed disability period began on that date.

On May 20, 2009 plaintiff was seen at Trumansburg Family Health Center by Maura McCauley, M.D.  Dr McCauley wrote: "Initially had compression fx from falling on tailbone. Then hurt back as car mechanic lifting something out of a car. Has tried many txs. Then began here with pain meds and as needed more, ended up going to Pain Clinic. Now with constant low and mid back pain, frequent muscle spasms all along his back."  She wrote: "Boss wants to rehire him but he feels he could only do light duty at most.  Would like a note to that effect."  She added: "Pt. given a note for light duty to try at work.  This may well exacerbate his sxs and he may need to go out of work in near future.  To continue meds with Pain Clinic"  She concluded: "Light Duty.  Pt. needs light duty at work.  May not lift more than 20#.  No excessive stretching, esp. with overhead activity."  Dr. McCauley stated that plaintiff's medications were percocet (oxycodone), muscle relaxer, oxycontin, and ibuprofen.

On May 22, 2009, Maura McCauley, M.D. wrote on a prescription pad that plaintiff was fully disabled and should not work due to severe back pain.

On August 4, 2009, Maura McCauley, M.D. submitted a "Multiple Impairment Questionnaire" ("MIQ") which includes the following: plaintiff's first treatment was May 17, 2000; he is treated every two months; her diagnosis is "chronic back pain with spasm since 1980 when he fell and sustained a compression fracture at L5.  He has also had re-injury since that time as a mechanic on lifting something out of a car"; the positive clinical finding supporting her diagnosis is "palpable muscle spasm upper & lower back frequently; tenderness over L5"; the diagnostic test result which supports her diagnosis is: "MRI 6/12/08; small central disc protrusion L5-S1 ventrally"; plaintiff's primary symptoms are "constant low & mid-back pain with frequent muscle spasms all along back, fatigue"; the nature of his pain is "muscle spasms plus severe ache

-21-

constantly; severe sharp spasm; electric feeling, shocks of pain"; the pain is "constant"; the pain is "some better with pain meds but still increased with any activity. To sit/stand any length of time creates stabbing/throbbing pain"; and the precipitating factors leading to the pain are "lifting, bending, twisting." Dr. McCauley estimated plaintiff's pain on a scale of one to ten as four "with med and without activity," seven "with med & activity," and nine without medications. She stated that plaintiff's fatigue when he was on medications was a level five (moderate), and that she has not been able to relieve plaintiff's pain completely with medication without unacceptable side effects.

Regarding plaintiff's RFC, Dr. McCauley reported in the MIQ that in an eight-hour day, he could sit for three hours and stand or walk for one hour; that it would be "necessary or medically recommended for [plaintiff] not to sit continuously in a work setting"; that he must get up and move around every 15 minutes; that after five minutes he could sit again; and that it would be "necessary or medically recommended for [plaintiff] not to stand/walk continuously in a work setting." She stated that he could frequently lift 0-5 pounds, occasionally lift 5-10 pounds and never lift more than 10 pounds.

The MIQ continued:

> List medication(s) prescribed, dosage, and any-side effects your patient has reported.
> a. Fentanyl patch; 25 & 12.5 patch q 48 – dizzy, sweats, fatigue
> b. Oxycodone 5/325 TID – fuzzy head, ST memory loss, trouble making decisions
> c. Amitriptyline 10 mg 2 – groggy next day
> d. Lidoderm patches 3-12 hrs on/12 off - tend to fall off
>
> Have you substituted medications in an attempt to produce less symptomatology or relieve side effects?
> Yes

***

How often is your patient's experience of pain, fatigue or other symptoms severe enough to interfere with attention and concentration?

      Frequently

Are your patient's impairments ongoing, creating an expectation on your part that they will last at least twelve months?

      Yes

***

Will your patient sometimes need to take unscheduled breaks to rest at unpredictable intervals during an 8-hour working day?

      If yes,  a.      How often do you think this will happen?

                        Every hour

              b.      How long (on average) will your patient have to rest before returning to work?

                        10 minutes

***

Are your patient's impairments likely to produce "good days" and "bad days"?

      Yes

If yes, please estimate, on the average, how often your patient is likely to be absent from work as a result of the impairments or treatment.

      About two to three times a month

***

In your best medical opinion, what is the earliest date that the description of symptoms and limitations in this questionnaire applies?

      Our earliest records are 5/17/00

On September 25, 2009, Dr. McCauley wrote:

Here for problem r/t his back pain. Seeing Pain Clinic. They have put him on 50 mcg of Fentanyl, changed q 48 hours for pain. This has worked well. Pain Clinic also has put him on Baclofen. It really helps the muscle spasms in his back. However, it makes him have episode[s] of tiredness and tightness in his chest.... Has tried to stop the Baclofen and the symptoms go away completely. Each time he took the med again he got the symptoms of fatigue and chest tightness again. He has tried eating with the Baclofen and avoiding caffeine but he continued to have symptoms despite these efforts. So he called the Pain Clinic and they told him to stop the med and come in here.

***

Current Meds: PT Fully Disabled. Pt. should not work d/t severe back pain, Light Duty Pt. needs light duty at work. May not lift more than 20#. No excessive stretching, esp. with overhead activity. Percocet 5-325mg 1 tid, Muscle Relaxer, ... Oxycontin 20 mg 1 po bid, Ibuprofen 800 mg One PO

Every 8 Hours With Food prn Pain
***
EKG looks fine and no change from EKG earlier this year. I think what he was experiencing is a medicine side effect and no long-term harm was done by the medication. He is to stay off Baclofen and f/u with Pain Clinic for an alternate med. F/u prn recurrent symptoms.

The file also contains a letter by Dr. McCauley dated November 2, 2009, addressed "To whom it may concern" and stating:

> Mr. Nagle has had problems with low back pain since an incident in approximately 1980 when he fell down hard in a sitting position. He has seen our office for more than 10 years for the complaint of low back pain. He had MRIs of his lumbobosacral spine in 8/06 and 6/08. Both show multiple level small disc herniations. Please see attached reports for details. In addition to the pain associated with the changes seen on MRI, the patient has significant muscle spasms all over his back. Despite his back symptoms, for many years he managed to continue working with over-the-counter pain medications. Over time the pain worsened but he still continued working with the help of stronger prescription pain medications. In the past year, his pain and muscle spasm have gotten so severe he has been unable to work and has had to be far less active than he had in the past. Any physical activity beyond walking seem to worsen his symptoms. He has done physical therapy in the past without long-lasting results. He has recently been seeing the Pain Management Clinic at Cayuga Medical Center. They are working with him to find an effective regimen of oral medications. He is currently taking Baclofen for muscle spasms all over his back. He is also on a Fentanyl patch, 50 mcg every 48 hours. These are providing him with fairly good relief at this point. They did not feel that any other modalities would likely be helpful for him at this time. Currently, he is seen in our office every 3-6 months. Pain Clinic follows him at least every 3 months. Given his slow worsening of symptoms, his prognosis for recovery is very poor and will certainly last greater than 12 months. In addition, because of his significant symptoms at present I do not think he is able to work at all. This disability will undoubtedly last more than 12 months.

**Records of Ithaca Center for Pain Management**

Plaintiff began treatment with Andrew Morpurgo, M.D. on January 24, 2007, and with Christina D. Morse, N.P on June 10, 2009, both at the Ithaca Center for Pain Management ("Pain Center") (also referred to in the record as Cayuga Medical Center Pain Clinic). The records of

-24-

plaintiff's treatment at the Pain Center include the February 4, 2009 pain management followup dictated by Dr. Morpurgo, stating: "[Plaintiff] returns today. He reports that his pain is about the same. He remains on his usual medications including OxyContin 20 mg twice a day, as well as oxycodone 5 mg for break through. He also takes ibuprofen as needed and Skelaxin on occasion." The assessment is "Lumbago/low back pain." The plan is to continue with current medications, with a follow-up in three months.

On May 6, 2009, Dr. Morpurgo saw plaintiff for a pain management followup. Dr. Morpurgo stated:

> HISTORY OF PRESENT ILLNESS: Mr. Nagle returns today. He reports significant back spasms worsening in intensity. He is now on tizanidine 4 mg twice a day, as well as OxyContin 20 mg twice a day, oxycodone 5 mg three times a day, and ibuprofen in between.
> ***
> ASSESSMENT:
> 1. Sciatica
> 2. Myofascial pain, right lumbar paraspinals.
> PLAN: We are gong to try a trigger point injection into his right lumbar paraspinals. The patient will continue tizanidine. He will take Elavil also at bedtime. He will cut his tizanidine back to 2 mg, 2 times a day, as the current dose is making him fatigued. He will follow up in 2 months with the nurse practitioner, Christina D. Morse, N.P to see if there is anything further we can do.

On June 10, 2009, plaintiff had a follow-up visit at the Pain Center. The names of both Dr. Morpurgo and Nurse Morse appear in print on the unsigned report. The notes state:

> CHIEF COMPLAINT: Low back pain, right-sided.
>
> HISTORY OF PRESENT ILLNESS: Mr. Nagle is here today for followup. He had suffered a back injury and currently is having great difficulty with functioning at work and most likely going to go on disability. He reports that the spasms he is having in the right flank area are maddening and at times he just have to lay down to get rid of them. He does notice that the oxycontin seems to work, but it causes fluctuation in his pain, he is always needing the

-25-

oxycodone mid-day and several times a day. He does take tizanidine 2 mg twice a day when needed for severe spasm, but when he takes that medication, he cannot function at all, and the Elavil that he takes at bedtime also seems to help, so at times the medication is helpful, allows him to remain active with continued pain, but at other times he is totally unaffected by the medicine and has to lay down to stop the pain and the spasm from occurring. He is interested in trying the fentanyl patch to see if that would give him better pain relief pattern and he is willing to try other muscle relaxants, but has tried Flexeril without any relief, has tried Skelaxin without any relief. He did not recall of ever being tried on Norflex. He currently is out of work.

\*\*\*

ASSESSMENT: History of sciatica, myofascial pain, right lumbar paraspinous spasm.

PLAN:

1. If pain worsens or does not improve, we could consider having him see Dr. Morpurgo for further trigger point injections. However, we will try to change his medications to give him better management of his pain.

2. He will start fentanyl patch 25 mcg change every third day. He can use the oxycodone 5 mg for the breakthrough pain and he should just stop the OxyContin and take the last dose when he puts the patch on.

3. We will ask for TENS replacement pads he will be calling and let us know if he needs a prescription and I will see him back in a month or sooner if necessary.

On June 25, 2009, plaintiff was seen again at the Pain Center. Again, the names of both Dr. Morpurgo and Nurse Morse appear in print on the unsigned report. The report includes the following:

Mr. Nagle is here today for followup to his opioid management of his pain. I last saw him in the clinic on 6/10/09. At that time, he was having significant spasm and breakthrough pain on the Oxycontin, which did not seem to be lasting a full 12 hours. We discussed changing him to fentanyl patch 25 micrograms per hour, changing it every third day. He called to discuss the efficacy of the patch and it seemed that he was having some problems about every 36 hours with increased breakthrough pain. Therefore, I saw him today at the office. The patient reports with using the fentanyl patch 25 that usually, day 2, is pretty good without spasms, pain level still is 3-4/10, and by day 3 morning prior to change, his pain is 6-7/10, therefore having less efficacy around 30 hours of wear. On the second day after putting on the patch, he can reduce the oxycodone to 2 or 3 a day. By the third day, he needs to take it every six hours or more often and the spasms are back.... A script for Percocet

-26-

was sent to the pharmacy on 05/22/09 for his breakthrough pain.

\*\*\*

ASSESSMENT: Myofascial pain, right lumbar paraspinal and sciatica.

PLAN: We will increase the fentanyl patch to 37 micrograms change every 72 hours....

The record contains a report of a follow-up visit at the Pain Center on August 27, 2009. The names of both Dr. Morpurgo and Nurse Morse appear in print on the unsigned report, which includes the following:

> [Plaintiff] reports that the change in the fentanyl patch to 37 mcg every 48 hours helped significantly, but he still is having intermittent spasticity of the right paraspinous muscles and sciatica that just comes on suddenly. The current medication he is taking for the spasms causes him to become greatly sedated and sleepy.... When he has pain, it is controlled with the breakthrough medication, Percocet, but no more than 3 a day. The Elavil helps him sleep.
>
> \*\*\*
>
> ASSESSMENT: Myofascial pain, right lumbar paraspinal and sciatica.
>
> PLAN: We will have him increase the fentanyl patch to 50 mcg changing it every 48 hours. Continue with the Percocet for the spasms. For the spacticity on the right side of the back, he will try baclofen 10 mg tab, 5 mg t.i.d., discontinuing the tizanidine....

On October 28, 2009 plaintiff was seen by Nurse Morse. She wrote:

> HISTORY OF PRESENT ILLNESS: Mr. Nagle is here today for follow up to medication management of his chronic pain. He has significant low back pain with spasm, and when I last saw him at the clinic, the tizanidine was causing sedation, and therefore, we changed him to Baclofen. He had tachycardia event and shortness of breath with taking the Baclofen and stopped it, but he felt that that worked very well in stopping the spasms in the back.... He is willing to retry Flexeril.
>
> CURRENT MEDICATIONS:
>
> 1. Lidoderm patches when needed.
> 2. Ibuprofen if needed.
> 3. Elavil 10 mg, 2 at bedtime.
> 4. Fentanyl patch 50 mcg change every 48 hours.
> 5. Percocet 5/325, 1-3 a day.
>
> \*\*\*
>
> ASSESSMENT: Myofascial pain, right lumbar paraspinous spasm and sciatica.

> PLAN: Continue on the increased fentanyl patch 50 mcg changing it every 48 hours, as well as the Percocet for the breakthrough pain. For the muscle spasms, we will have him try cyclobenzaprine 10 mg, ½ to 1, 3 times a day.... I would like him to try the Celebrex 200 mg once a day for a month and then as needed to see if that would decrease some of his pain as well.

Nurse Morse completed a "Spinal Impairment Questionnaire" dated December 3, 2009. She wrote that plaintiff began treatment with Dr. Morpurgo at the Pain Center on January 24, 2007, and with Nurse Morse on June 10, 2009. He was treated every two or three months and his most recent examination was October 28, 2009. The diagnosis was myofascial pain, right lumbar paraspinals, and sciatica. He had a limited lumbar range of motion, lumbar tenderness, and lumbar muscle spasm. He had trigger points at right lumbar paraspinals. As to whether plaintiff's symptoms and functional limitations were reasonably consistent with his physical impairments, she answered, "Yes." To the question, "Have you been able to completely relieve the pain with medication without unacceptable side effects?" she responded, "No." Asked to list medication(s) prescribed, dosage, and any side effects the patient has reported, she wrote: "Baclofen 'fatigue & rapid heart rate'; Flexeril "loopy"; Celebrex 200 mg q day; Flexeril 10 mg 1/2-1 q 8 hr prn spasm; Fentanyl Patch 50 mcg q 48 hr change; Elavil 20 mg; Lidoderm Patch prn, Ibuprofen prn." She wrote that they have substituted medications in an attempt to produce less symptomatology or relieve side effects, and that plaintiff has physical therapy, trigger point injections, and a TENS unit. To the question, "How often is your patient's experience of pain, fatigue or other symptoms severe enough to interfere with attention and concentration?" she responded, "Constantly." To the question, "Are your patient's impairments ongoing, creating an expectation on your part that they will last at least twelve months?" she responded, "Yes." She recommended a functional capacity evaluation "to give proper guidance to work restrictions."

Plaintiff's next followup visit was December 28, 2009.  He was seen by Nurse Morse, who reported as follows:

> [Plaintiff] reports that overall he has been feeling better.  However, by the second day when he needs to replace his patch, he has a lot of difficulty with increased pain and problems 3-6 hours after putting the new patch being excessively sleepy.  He is tolerating the cyclobenzaprine, but that also cause him to be very tired.  He is taking about half twice a day on average. He did change from the ibuprofen due to GI upset to Aleve.  He takes 2 of them twice a day, and has noted about 3-4 times a week he is having heartburn symptoms, which he has never had in the past, except when taking ibuprofen.  He has not tried any proton pump inhibitors in the past or presently, and is willing to try that....
> \*\*\*
> ASSESSMENT: Lumbago, myofascial pain, right lumbar paraspinous spasms
> PLAN:
>> 1. We will have him utilize brand-name Duragesic patch 50 mcg changing it every 48 hours.  In the event that he feels that the patch is lasting more than 48 hours, he could certainly try every 3 days.
>> 2. He will continue on cyclobenzaprine, was given a prescription for that today.
>> 3.We will start him on Protonix 40 mg once a day in the morning, a half hour before meal, hopefully that will help him to tolerate the Aleve better. In the even that he fails to respond to this treatment and continues to have gastroesophageal reflux disease symptoms, we will request his insurance approve Celebrex.
>> 4. I will see him back in 1 month.

**Report of Dr. Persaud, Consulting Examiner**

The October 1, 2009 report of Look Persaud, M.D., consulting examiner for the Division of Disability Determination, noted that plaintiff was using a fentanyl patch, ibuprofen, amitriptyline, and oxycodone.  Dr. Persaud reported:

> GENERAL APPEARANCE, GAIT, BEHAVIOR, STATION:  The claimant appeared to be in moderate acute and chronic distress. He was noted to experience intermittent spasms of his back, some quite severe with jerking of his upper body. These were noted during the evaluation. Gait normal. He had

difficulty walking on heels and toes, complaining of pressure in his back. He was able to squat 1/3 of full, complaining of back pain. Station normal. Used no assistive device. Needed no help changing for the exam or getting on and off exam table. Able to rise from chair without difficulty.

\*\*\*

THORACIC AND LUMBAR SPINES: Limited painful ROM: He was able to flex to 70 degrees, extend to 10 degrees, lateral flexion left and right 20 degrees each, rotation right and left 20 degrees each. He has moderate paraspinal tenderness. He has right sacroiliac joint tenderness. There were intermittent severe spasms of the back during the evaluation. The spasms appeared to be more pronounced with movements and various maneuvers during the evaluation. No scoliosis or kyphosis. SLR test negative bilaterally. No trigger points.

LOWER EXTREMITIES: Full ROM of hips, knees, and ankles bilaterally. He complained of low back pain and again had severe back spasms with ROM of his hips and knees. Some of the spasms were again of a jerking type with back pain noted with ROM activities of his lower extremities. Strength 5/5 in proximal and distal muscles bilaterally. No muscle atrophy. No sensory abnormality. Reflexes physiologic and equal. No joint effusion, inflammation, or instability.

\*\*\*

DIAGNOSIS: Low back pain with severe spasms radiating up to the mid back and intermittently down into the right buttock area.

PROGNOSIS: Guarded.

MEDICAL SOURCE STATEMENT: Based on today's evaluation, he has mild restriction from prolonged sitting, standing and walking on even surfaces. Moderate restriction from walking on uneven terrain, up inclines, ramps and stairs. Moderate to marked restriction from squatting, kneeling, crawling, bending, twisting and turning. Moderate to marked restriction for lifting, carrying, pushing and pulling. Mild to moderate restriction from reaching overhead and mild restriction from reaching in other planes, as these movements trigger back pain and spasms. No restriction for fine motor activity of hands. No restriction to speaking, seeing and hearing. It is doubtful the claimant can travel via public transportation at this time.

**Vocational Expert**

The Commissioner called Dr. Newton, a vocational expert, to testify at the October 6, 2010 hearing. His testimony under questioning by the ALJ was as follows:

Q ... I'd like you to assume a hypothetical individual the Claimant's age, education and work background. Assume further this individual can lift and

carry up to 20 pounds occasionally, 10 pounds frequently at waist level, avoid above shoulder lifting, carrying, pushing, pulling and reaching, also avoid picking up small objects or flat objects from floor level. The individual can stand about six hours in an eight hour day, sit six hours in an eight hour day and walk about 200 yards. The individual should avoid pushing and pulling less than five pounds, avoid climbing ladders, ropes and scaffolds, avoid crawling, kneeling, perform other [INAUDIBLE] occasionally, is limited to simple, routine, low stress tasks. Could such an individual perform the Claimant's past work?

A No, Your Honor.

Q Could you identify any light jobs such an individual could perform?

A Yes, Your Honor. The first available is what the Dictionary of Occupational Titles refers to as a ticket seller. It's DOT No. 211.467-030, it's exertionally light, it's unskilled, with an SVP of two, some 900 in the state 's economy and 100,000 in the national economy. Gate attendant –

***

A Gate attendant.

Q All right. Thank you.

A It is DOT No. 344.667-010, it's exertionally light, it's unskilled, with an SVP of two, some 900 in the state's economy, 38,000 in the national economy. Also as an office helper, DOT No. 239.567-010, it's exertionally light, it's unskilled, with an SVP of two, some 3,000 in the state's economy, 100,000 in the national economy, sir.

Q Is your testimony consistent with the information contained in the Dictionary of Occupational

Titles?

A Yes, Your Honor.

Q Hypothetical 2. If the individual needed a sit/stand option at will, could the individual perform those jobs?

A Yes, Your Honor.

Q Third hypothetical. One moment, please. Assume the individual could sit no more than three hours, stand one hour, lift and carry 10 pounds occasionally, five pounds frequently, frequently experience pain severe enough to interfere with attention and concentration and would be absent from work about two to three times per month. Could the individual perform those jobs?

A No, Your Honor.

Q Could you identify any work in the national economy such an individual could perform?

A No, sir. Not within that residual functional capacity.

Q Okay. Thank you. The jobs that you cited, do they require a person to lift and carry more than 10 pounds occasionally?

A No, sir.

Plaintiff's attorney then questioned the vocational expert as follows:

> Q Dr. Newton, can you clarify? You said that the sit/stand option would be
> a possibility for the three hypothetical jobs that you listed?
> A Yes.
> Q And suppose that the hypothetical individual required a 15 minute break
> every hour or two to lie down. Would this individual be able to sustain those
> jobs?
> A No. That would be deemed as excessive.

## DISCUSSION

The Court agrees with plaintiff that the ALJ's evaluation of plaintiff's residual functional capacity ("RFC") is not supported by substantial evidence in the record. Therefore, the record does not support the ALJ's conclusion that, based on plaintiff's RFC, age, education, and work experience, plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." To the contrary, the record establishes as a matter of law that plaintiff was disabled for purposes of the Social Security Act from December 1, 2008 until November 9, 2010. For the reasons set forth below, the Court grants plaintiff's motion for judgment on the pleadings (Dkt. No. 9), denies defendant's motion for judgment on the pleadings (Dkt. No. 13), and remands for calculation of benefits

Plaintiff was treated at Trumansburg Family Health Center for his back pain and spasms from 2002 through the time of the hearing. Dr. McCauley of that practice began treating plaintiff no later than May 20, 2009. She saw him every three to six months, and her records reflect a detailed knowledge of his condition. In the "Multiple Impairment Questionnaire" ("MIQ") completed by Dr. McCauley on August 4, 2009, she estimated plaintiff's pain on a scale of one to ten as four "with med and without activity," seven "with med & activity," and nine without medications. She has not been able to relieve plaintiff's pain completely with medication without

unacceptable side effects. The MIQ includes the following regarding plaintiff's ability to sit or stand during an eight hour workday: "To sit/stand any length of time creates stabbing/throbbing pain." Dr. McCauley opined that in an eight-hour day, plaintiff could sit for three hours and stand or walk for one hour; that it would be "necessary or medically recommended for [plaintiff] not to sit continuously in a work setting"; that he must get up and move around every 15 minutes; that after five minutes he could sit again; and that it would be "necessary or medically recommended for [plaintiff] not to stand/walk continuously in a work setting." She indicated that plaintiff would "sometimes need to take unscheduled breaks to rest at unpredictable intervals during an 8-hour working day" and that this would happen every hour. She added that, on average, plaintiff would have to rest at least 10 minutes before returning to work. To the question, "How often is your patient's experience of pain, fatigue or other symptoms severe enough to interfere with attention and concentration?" she responded: "Frequently." She stated that plaintiff was likely to be absent from work as a result of the impairments "[a]bout two to three times a month." Dr. McCauley's statements on the MIQ are overall consistent with and supported by the records of the Trumansburg Family Health Center.

Common sense dictates that, if Dr. McCauley's determinations are accepted, plaintiff would be unable to work. Indeed, Dr. Newton, the vocational expert called by the Commissioner, stated that a hypothetical person with the limitations described by Dr. McCauley could not perform any work. Specifically, Dr. Newton answered "No" when asked whether there was any work in the national economy that could be performed by a person with the following limitations: "Assume the individual could sit no more than three hours, stand one hour, lift and carry 10 pounds occasionally, five pounds frequently, frequently experience pain severe enough to interfere

-33-

with attention and concentration and would be absent from work about two to three times per month." And when asked whether a hypothetical individual who required a 15 minute break every hour or two to lie down would be able to sustain the jobs proposed by Dr. Newton, he answered: "No. That would be deemed as excessive."

The ALJ defined plaintiff's RFC as follows:

> [Plaintiff] has the residual functional capacity to: lift and carry 20 pounds occasionally and ten (10) pounds frequently at waist to chest level; stand a total of six (6) hours in an eight (8) hour workday; sit a total of six (6) hours in an eight (8) hour workday; walk a total of 200 yards in an eight (8) hour workday; push or pull less than five (5) pounds occasionally; never climb ladders, ropes, or scaffolds; never crawl or kneel; occasionally balance, stoop, and crouch; and perform simple, routine, and low stress tasks.

The ALJ's evaluation of plaintiff's RFC is not supported by the record evidence. In fact, there is no competent evidence in the record that plaintiff can stand and sit a total of six hours in an eight hour workday.[3] As noted, Dr. McCauley opined that in an eight-hour day, plaintiff could sit for three hours and stand or walk for one hour; that he would sometimes need to take unscheduled breaks to rest at unpredictable intervals during an eight-hour working day; that he would have to rest at least 10 minutes before returning to work; and that this would happen every hour. Plaintiff testified that after an hour or two of sitting he would need to lie down on an ice pack. Neither Dr. Morpugo nor Nurse Morse expressed an opinion on the issue. The consultative examiner, Dr. Persaud, merely stated that plaintiff had "mild restriction from prolonged sitting, standing"; this

---

[3] The only statement in the record upon which the ALJ could have based his finding that plaintiff could sit or stand for six hours is the Physical Residual Functional Capacity Assessment completed on October 7, 2009 by Single Decision Maker ("SDM") D. Gruder. He wrote: "We disagree with any sitting limitations because clt is capable of many sedentary activities during the day.... Otherwise, clt is capable of standing and walking 6/8." It is well established that assigning any evidentiary weight to an SDM's opinion is error, see *Martin v. Astrue*, 2012 WL 4107818, *15 (N.D.N.Y. Sept. 19, 2012), and the ALJ did not cite to Gruder's statement.

unspecific evaluation is insufficient to support the ALJ's finding that plaintiff could sit and stand a total of six out of eight hours. The Court notes also that Dr. Persaud observed that plaintiff appeared to be in moderate acute and chronic distress and "experience[d] intermittent spasms of his back, some quite severe with jerking of his upper body" during the examination.

In reaching his determination of plaintiff's RFC, the ALJ explicitly assigned "little weight" to the opinion of Dr. McCauley regarding the nature and severity of plaintiff's impairments and their limiting effect on his ability to work. This was error. As explained below, under the treating physician rule, Dr. McCauley's opinion on the nature and severity of plaintiff's impairments and what he can do despite the impairments is entitled to controlling weight.

The treating physician rule "generally requires deference to the medical opinion of a claimant's treating physician[.]" *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). Where a treating source's opinion on the nature and severity of a claimant's impairments and what he can do despite the impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record," it is entitled to "controlling weight." 20 C.F.R. § 404.1527(c)(2). First, it is undisputed that Dr. McCauley was plaintiff's treating physician. The record amply demonstrates the frequency of examination and the length, nature and extent of the treatment relationship. Plaintiff was treated at Trumansburg Family Health Center for his back pain from 2002 through the time of the hearing. Two MRIs were performed. Dr. McCauley of that practice began treating plaintiff no later than May 20, 2009. She saw him every three to six months, and her records reflect a detailed knowledge of his condition. Indeed, the ALJ recognized that Dr. McCauley was plaintiff's treating physician and that she had "an extensive treatment history with plaintiff."

The record further establishes that Dr. McCauley's opinion regarding the nature and severity of plaintiff's impairments and the resultant limitations in what he could do is well-supported by medically acceptable clinical and laboratory diagnostic techniques, including two MRIs. Her opinion is also supported by and consistent with almost all other evidence in the record. In this regard, the Court notes first that Dr. McCauley's opinion is supported by and consistent with the extensive medical records from the Ithaca Center for Pain Management ("Pain Center"). The Pain Center treated plaintiff regularly for his back pain beginning January 24, 2007. Its records clearly demonstrate the increasing severity of plaintiff's pain and spasms and the efforts of Dr. Morpurgo and Nurse Morse to relieve them.[4] These efforts resulted in a steady increase in the number and dosage of opioid pain medications, other pain medications, and muscle relaxants prescribed for plaintiff. A number of medications caused unacceptable side effects; for example, notes from the Pain Center show that tizanidine was causing sedation, so plaintiff was changed to baclofen, which caused a tachycardia event and shortness of breath, requiring that it be discontinued as well. Other treatments, such as trigger point injections and physical therapy, were also attempted without lasting success. On May 6, 2009, Dr. Morpurgo noted that plaintiff's back spasms were worsening in intensity. In the "Spinal Impairment Questionnaire" dated December 3, 2009, Nurse Morse reported that the Pain Center had been unable to relieve the plaintiff's pain completely with medication without unacceptable side effects; that plaintiff's symptoms and functional limitations were reasonably consistent with his physical impairments; and that plaintiff's experience of pain, fatigue or other symptoms was severe enough to interfere

---

[4] The Court treats Nurse Morse's findings and opinions as other source evidence relevant to the severity of plaintiff's impairment and how it affects his ability to work. 20 C.F.R. § 416.913(d).

"constantly" with his attention and concentration.

Dr. McCauley's opinion is also supported by the report of Dr. Persaud, consulting examiner, insofar as he stated that during his evaluation, plaintiff "appeared to be in moderate acute and chronic distress" and "experience[d] intermittent spasms of his back, some quite severe with jerking of his upper body." Dr. Persaud noted that the spasms "appeared to be more pronounced with movements and various maneuvers during the evaluation." Dr. Persaud's diagnosis was "Low back pain with severe spasms radiating up to the mid back and intermittently down into the right buttock area." Dr. Persaud found that plaintiff had "mild" restriction from prolonged sitting or standing and "moderate to marked" restriction for lifting, carrying, pushing and pulling. He did not define the terms mild, moderate or marked, or how the restrictions would affect what plaintiff could do in the workplace. Dr. Persaud's vague findings are insufficient to contradict Dr. McCauley's specific findings or to constitute substantial evidence conflicting with Dr. McCauley's opinion.

In addition, Dr. McCauley's findings and opinions regarding the nature and severity of plaintiff's impairments and their impact on his ability to function in the workplace are overall consistent with plaintiff's testimony and his statements on various written forms. Specifically regarding sitting and standing and the need for taking breaks, plaintiff testified on October 6, 2010 that his back pain had gotten so bad that he "can't stand or sit for ... more than an hour or two"; that he experiences severe back spasms "every day"; that when the spasms begin, he "always ha[s] to lay down on the floor and usually apply an ice pack to it just to calm the spasms down"; that "the best thing for [him] to do is to rest on a hard surface or lay down in a very hard bed to relieve the back spasms"; and that when he uses the computer or watches TV he lies almost horizontally.

Asked at the hearing about sitting upright, he stated:

> A  I can sit for an hour and then I usually have to get up. I mean, an hour is about my max. If I push myself on a good day, for two hours in a seated chair. As long as it's a straight back like I'm in now, that's the best position, but two hours, I'm usually going to end up having some pain.
>
> Q  And when will you experience that pain?
>
> A  Just like within, you know, an hour or two of sitting it's just, it will start increasingly getting worse, and if I don't relieve it with a ice pack either by laying it on and pressing back, or the best bet is to actually just lay down on a ice pack.
>
> Q  Do you find that you can sit longer if you alternate between sitting and standing?
>
> A  No. It doesn't really help at all.
>
> Q  Okay. So what provides relief?
>
> A  Laying down, definitely, to get the, I don't know if it's pressure on a nerve or what it is, but that spasm, when it hits me it's like a knife stabbing me in the back.

Plaintiff further testified:

> Q  And what about a job not as demanding as your previous work? What about a job where you would be able to sit or stand at your choosing, and you didn't have to do any heavy lifting and it was pretty straightforward, simple? Would you be able to do that kind of job 40 hours a week?
>
> A  No. I mean there's really no way I can stay on my feet or back and forth sitting and standing  without having to at least go lay down and apply the ice or take enough medicine to be coherent enough to do a job.  I mean I have some medicines that can definitely help kill a lot of the pain, but then I'm just a gob of goo, I would say, that it just relaxes me so much and kills the pain that I just sleep throughout a good part of some days .
>
> Q  So in this job how often would you be requiring breaks to lie down?
>
> A  Probably every two hours would be nice.
>
> Q  And for how long, approximately?
>
> A  If I'm just going to lay down to take a break to be able to just continue to go back to work, I'd have to at least ice down for 10, 15 minutes, but if I did that every day it would just compile and catch up to me and just put me down.
>
> Q  So you think after several days you might be able to handle it , but then over time, over a week or two --
>
> A  It wouldn't even take a week.
>
> Q  How long do you think you'd be able to sustain that?
>
> A  If I pushed myself, three days. It's usually, if I try to stay on my feet and do something for like three days in a row, it's usually going to put me down

> for a couple of days of being able to really take it easy, overmedicate with the muscle relaxers, which knock me on my butt.

This testimony is overall consistent with plaintiff's written answers on various forms and is well supported by the opinions of his treating physicians Drs. McCauley and Morpurgo, and his treating nurse practitioner Nurse Morse. Thus, the Court finds that plaintiff's statements about the intensity, persistence, and functionally limiting effects of his pain and other symptoms are substantiated by objective medical evidence.

In discounting plaintiff's statements regarding his functional limitations, the ALJ wrote:

> Although the claimant alleges significant functional limitations, evidence demonstrates that he engages in a wide range of activities of daily living. During the internal medicine examination, he informed Dr. Persaud that he does no lifting; however, such statement is inconsistent with his testimony regarding his hobby of flying remote controlled helicopters. Additionally, the claimant reports being able to prepare simple meals, do light housecleaning, go shopping once a week, and adequately care for his personal needs. He enjoys watching television, listening to the radio, reading, going for walks, and socializing with friends.

(Citations to record omitted.) The ALJ's summary of plaintiff's activities of daily living does not fairly reflect plaintiff's statements. There is no evidence regarding the weight of a remote-controlled helicopter; the fact that plaintiff had such a hobby does not support a finding that plaintiff was capable of lifting more than 10 or 20 pounds.[5] As for shopping, plaintiff stated: "If I drive to the store to pick up an item or two throughout the week it's before noon, and that's about the time that I have to take my medicine for break through pain." He drives about 20 miles a week, spread out over "quite a few different drives." Plaintiff's testimony regarding house cleaning was: "Dust, dishes. (Sometimes run the vacuum, on a good day only, one room.) Turn

---

[5] Plaintiff stated that he had to walk about 25 yards to the landing pad in the back yard, and could only engage in that activity for 30-40 minutes on a nice day.

on the washing machine." Plaintiff stated that he lies down to watch television; he can walk 200 yards without lying down to rest, but on a bad day only 10-25 yards; and socializes primarily by way of computer while lying down propped up with a pillow. The ALJ's determination that plaintiff's "statements concerning the intensity, persistence, and limiting effects of his impairments are not credible to the extent that they are inconsistent with the [ALJ's] residual functional capacity assessment" is not supported by plaintiff's testimony about his activities of daily living or by other record evidence.

The minor inconsistencies in Dr. McCauley's reports cited by the ALJ do not support a determination that Dr. McCauley's opinion on the nature and severity of plaintiff's impairments and his resultant limitations is inconsistent with substantial evidence in the record. In particular, inconsistencies in comments by Dr. McCauley regarding whether plaintiff is "fully disabled" or "needs light duty at work" are not significant when read in context; moreover, as the ALJ points out, the "ultimate finding of whether a claimant is disabled and cannot work is reserved to the Commissioner." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (quoting 20 C.F.R. § 404.1527(e)(1) (internal quotation marks and alterations omitted)). Viewed in the context of the lengthy and detailed medical record, the fact that Dr. McCauley stated both that plaintiff could lift no more than 10 pounds and that he could lift no more than 20 pounds does not create a significant inconsistency.[6] Rather, Dr. McCauley's specific, nonconclusory findings regarding plaintiff's ability to sit or stand, his need for frequent breaks, his likely absenteeism, and the effects of his pain and medications on his ability to concentrate are supported by the record

_____

[6] The fact that plaintiff had a limited ability to lift is undisputed; even Dr. Persaud opined that plaintiff had a "moderate to marked" restriction for lifting. In any event, the vocational expert stated that all three jobs he proposed would not require a person to lift and carry more than 10 pounds occasionally.

evidence and are overall consistent with the record as a whole.

Accordingly, the Court concludes that the opinion of Dr. McCauley regarding the nature and severity of plaintiff's impairments and the resultant functional limitations is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." It is thus entitled to be given controlling weight under the treating physician rule. 20 C.F.R. § 404.1527(c)(2).

Even accepting the ALJ's determination that Dr. McCauley's opinion was not entitled to controlling weight under the treating physician rule, the record evidence establishes that it is entitled to great weight. The standard regarding the weight to be given to the medical opinion of a treating physician is as follows:

> An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various "factors" to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527(d)(2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32.

Applying the five *Halloran* factors, the Court finds that the record does not support the ALJ's decision to afford little weight to Dr. McCauley's medical opinion regarding the severity of plaintiff's symptoms and their limiting effects. As for the first factor, the ALJ found and the record establishes that Dr. McCauley had "an extensive treatment history with plaintiff." Regarding the second *Halloran* factor (the evidence in support of Dr. McCauley's opinion), and the third factor (whether her opinion is consistent with the record as a whole), the Court has

-41-

already found that Dr. McCauley's opinion is supported by the record and consistent with the record as a whole. Regarding the fourth factor – whether Dr. McCauley is a specialist – the ALJ stated: "Dr. McCauley is a family practitioner not likely qualified to assess the claimant's work limitations." There is no basis in the record to find that, as his treating physician, Dr. McCauley was not qualified to evaluate the limiting effects of the pain and spasms plaintiff has experienced for years. In giving significant weight to the opinion of Dr. Persaud concerning plaintiff's functional limitations, the ALJ stated: "Although the opinion of Dr. Persaud is based upon a one-time examination, he is an orthopedic specialist who is in a better position to assess the claimant's work-related limitations stemming from a back disorder." There is no record support for this determination. Dr. Persaud is not certified by the American Board of Medical Specialties ("Board") in Orthopedic Surgery or in any other specialty. Rather, he was Board certified in Family Medicine until 1990 and appears to have no other certifications, whereas Dr. McCauley continues to be Board certified in Family Medicine, and Dr. Morpurgo, whose records support Dr. McCauley's opinion, is Board certified in Physical Medicine and Rehabilitation. The fifth factor is "other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." The Court notes only that the ALJ's finding that plaintiff "is currently using a regimen of oral medications which provide fairly good relief of his symptoms," is in error. For example, in support of this finding, the ALJ stated that plaintiff "was prescribed Baclofen which, per his report, really helps the muscle spasms in his back." The medical record (Dr. McCauley's notes of September 25, 2009 and Nurse Morse's notes of October 28, 2009) shows, however, that baclofen caused a tachycardia event and shortness of breath, requiring that it be discontinued. Analysis of the *Halloran* factors in light of the consistent and virtually

-42-

uncontradicted evidence in the record establishes that, even accepting the ALJ's decision to deny Dr. McCauley "treating physician" status, her opinion regarding the severity of plaintiff's symptoms and the resultant limitations in what he could do was entitled to great weight. The record evidence does not support the ALJ's decision to accord her opinion little weight.

To conclude, upon reviewing the entire record and examining all the evidence, the Court holds that there is no reasonable view of the evidence upon which it could be found that plaintiff retains the RFC defined by the ALJ. To the contrary, the record establishes as a matter of law that plaintiff retains the RFC defined by his treating physician, Dr. McCauley, that is, that plaintiff could sit no more than three hours and stand or walk for no more than one hour; that he would need unscheduled breaks to rest at unpredictable intervals during an 8-hour work day; that during the period of an hour he would need to rest at least 10 minutes before returning to work; that he would frequently experience pain severe enough to interfere with attention and concentration; and that he would be absent from work about two to three times per month. The ALJ's sole reason for affording significant weight to Dr. Persaud's arguably inconsistent opinion – *i.e.*, that he is an orthopedic expert – finds no support in the record. In addition, Dr. Persaud examined plaintiff only once and did not report any specific findings that contradict Dr. McCauley's specific findings regarding plaintiff's limitations, in particular his ability to sit and stand for a period of time, the frequency of his need for breaks, his likely absenteeism, and the effects of his condition on his ability to concentrate. As such, Dr. Persaud's opinion in this regard is entitled to minimal weight and does not constitute substantial evidence inconsistent with Dr. McCauley's opinion. The findings of Dr. Morpurgo as a treating medical source and Nurse Morse as another source are consistent with and support Dr. McCauley's opinion. In addition, the findings of Drs. McCauley

and Morpurgo and Nurse Morse are consistent with and supportive of plaintiff's testimony and his written responses on various forms.

Having accepted plaintiff's RFC as defined by Dr. McCauley, the Court finds no record evidence that plaintiff is capable of doing any substantial gainful activity. Indeed, the testimony of the Commissioner's vocational expert, Dr. Newton, establishes as a matter of law that an individual with plaintiff's RFC is unable to work. There is no basis to conclude that further development of the record would disclose evidence supporting the ALJ's determination in this regard; therefore, remand for further evidentiary proceedings would serve no purpose. The record, which is adequately developed, conclusively establishes that plaintiff was disabled for purposes of the Social Security Act from December 1, 2008 to November 9, 2010.

## CONCLUSION

It is therefore

ORDERED that plaintiff's motion for judgment on the pleadings (Dkt. No. 9) is granted; and it is further

ORDERED that defendant's motion for judgment on the pleadings (Dkt. No. 13) is denied; and it is further

ORDERED that the Commissioner's decision is reversed and the matter is remanded for calculation of benefits.

IT IS SO ORDERED.

Date:   June 23, 2014
        Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge